## Suter et al. v. Suter.

March 21, 1939.

LESLIE W. MORRIS and MARION RIDER for appellants.
E. C. O'REAR and POLK SOUTH for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Reversing.

This is a suit by Robert H. Suter, brother of the late Mrs. Ella S. Parker, against certain devisees and the executor of her will, for specific performance of an alleged contract to convey to him two tracts of land, or damages for breach of the contract. He elected to prosecute his claim for enforcement. The circuit court ordered the conveyance to him of what is known as the "Hannen Farm" of 72.62 acres, and the "Smith Farm" of 42 acres. The defendants question the chancellor's conclusion that there was a contract. Subsidiary questions need not be determined.

The background in a lawsuit helps to an understanding of the implications inherent in the evidence. Mrs. Parker's husband, George W. Parker, died in 1925. She acquired title to the Hannen farm and what is known as the "Hockensmith Farm" of 156 acres from her husband. She purchased the Smith farm later. The land is good and all the tracts are contiguous. Her personal estate, principally in securities, was valued at about $20,000. Of her immediate family, there remained two brothers, Ben Suter, who lived in Oklahoma, and the plaintiff, Robert H. Suter. During the period in which the instances of the case occurred, and at her death in October, 1934, Mrs. Parker lived in Frankfort with a companion servant, Mrs. Sophronia Bridges. She was a woman of intelligence and good judgment and had successfully managed her business affairs with but little assistance. Possessed of comparatively much of this world's goods, she had also the virtues of a good heart and bounteous nature, concomitants of a Christian spirit. That she was just and charitable, generous and kind to her relatives and others is not questioned. When the alleged contract was made in 1928 or 1929, she was about 66 years old.

Robert H. Suter had gone to Texas to live in 1904. He seems to have prospered for he acquired a large farm and was an active, substantial citizen of Wichita Falls. In 1913 he sold out and purchased a farm of 720 acres near Stuttgart, Arkansas, and a residence in

that city. For some time there was no encumbrance on the land but later a mortgage for $12,500 was placed upon it. In 1920, Mr. Suter contracted to sell his farm for $54,000, but a devastating flood came that year, breaking the levees of the Mississippi and Arkansas Rivers, and working havoc and disaster to the property. This resulted in the cancellation of the contract. See Suter v. Mason, 147 Ark. 505, 227 S. W. 782. Following this the price of cotton and rice dropped materially. Another flood in 1927 overflowed his farm. Other misfortunes came upon him, so that by 1928 Mr. Suter was hard pressed and the way was rough. Formerly he had visited his old home in Franklin County every two or three years, but it had been eighteen years since he had done so. However, he had kept up correspondence with his people, especially with his sister, Mrs. Parker.

Though heavily involved, Mr. Suter insists in this case that he was carrying his burdens and getting along. As plaintiff and appellee, he says that Mrs. Parker was in ill health and oppressed with the care of her business. These conditions, together with a tender tie of affection, it is maintained, motivated Mrs. Parker to propose to her brother that he dispose of his equities in Arkansas and come to Kentucky and look after her farms. In consideration therefor she agreed to convey or devise to him the Hannen and Smith farms above described. Following much insistence upon her part and reluctance on his part, after a visit to her in May, 1928, it is claimed he, in writing, definitely accepted her proposition that he should wind up his affairs in Arkansas, even at a sacrifice, and come to her. After vainly trying to dispose of his property he filed a voluntary petition in bankruptcy in January, 1929, and later that year was adjudicated a bankrupt. Suter and his wife moved to Frankfort in November of that year and, after living in the city until spring, moved to the Hockensmith place and a year later to the Hannen farm. He superintended all the farms, though they were principally cultivated by tenants, and substantially improved them. We think it is shown also that he did relieve Mrs. Parker of many responsibilities and details. For this he seems to have been compensated.

By the other side it is maintained that there was never any intention or purpose on the part of Mrs. Parker to enter into such a contract with her brother

as claimed, and that the evidence does not show that she did so. Furthermore, that in insisting upon her brother relieving himself of his heavy burdens of debt and his hopeless struggle to carry on she was motivated solely by the desire to share her good fortune for his comfortable support, and that as brother and sister, between whom, as already suggested, there was a strong tie of devotion, they might travel together the last few miles of their journey of life. She had no children and both of his daughters were far from home. One was in Calcutta, India, and the other in Los Angeles, California. The appellants' interpretation of statements in the correspondence is that they constituted only a gratuitous promise, nothing other than a testamentary gift being intended. They say that in exchange the brother, as a promisee, surrendered nothing and profited much.

The law in cases of this kind is well defined. It is enough to bear in mind that phase of it which demands that a party asserting such a contract shall establish it by clear and convincing evidence. This goes to the existence of a writing signed by the party to be charged, sufficiently definite in its terms as to enable identification of the property and its enforcement, and as well to proof of a consideration therefor. In short, specific performance requires specific proof. If there be reasonable doubt as to any of these things, equity will not grant relief for fear of doing a greater wrong than by leaving the parties to their legal remedy. It must appear that good conscience and substantial justice require it. 25 R. C. L. 337; Preece v. Wolford, 196 Ky. 710, 246 S. W. 27; Chilton's Adm'r v. Shelley, 243 Ky. 576, 49 S. W. (2d) 305; Kentucky-Pennsylvania Oil & Gas Corp. v. Clark, 247 Ky. 438, 57 S. W. (2d) 65; Miller v. Prater, 267 Ky. 11, 100 S. W. (2d) 842; Hennessy v. Woolworth, 128 U. S. 438, 9 S. Ct. 109, 32 L. Ed. 500.

The plaintiff relies upon a contract evidenced by correspondence, an important and possibly controlling part of which is undertaken to be proved by parol evidence as lost documents. Concerning any lost writing, always such evidence must be clear and satisfactory. Where the instrument is a muniment of title to real estate, the demands of public policy and security of ownership require more assuring proof of its former existence, its contents and its loss, than if it were a writing less extensive in effect. This standard or de-

gree of proof is defined as being "strong and conclusive," for the absence of the writing and the dependence upon the fallibility of memory and the frailty of human nature presents a situation pregnant with opportunity for injustice and fraud. Chilton's Adm'r v. Shelley, supra. A lost letter upon which one bases his claim of an express contract to convey real estate, and a right to specific enforcement, was held in that case to rise to such dignity.

We turn to state and weigh the evidence concerning the lost writings upon which the plaintiff relied.

Miss Mary K. Suter, a daughter of the appellee, is a young lady of accomplishment, and before 1928 held responsible positions in Memphis, where she was admitted to the Bar. She now lives in Los Angeles. Miss Suter testified that during 1926 and 1927, and up until May, 1928, when her father returned from his visit to Kentucky, she went to her parents' home in Arkansas every few weeks. They kept the family letters for her and during this period she read from sixty to seventy-five letters from Mrs. Parker. Shortly after her father's return there was a family conference, at which it was definitely decided that her father should accept her aunt's offer. He wrote a letter to her to that effect, which the witness read and saw posted. In relating the contents of this and of her aunt's letters in haec verba, including some family chit-chat, the witness displayed a remarkable memory. Too remarkable. We think, however, the record does not authorize the court to consider this evidence as competent because of insufficient proof as to the non-existence of these letters. Her interrogation and response is merely this:

"Q. Do you know where those letters are now? A. I have no idea.

"Q. Do you know whether they are available? A. I do not know.

"Q. You have not seen them since the respective times that you examined and read each one? A. No."

It is observed the defendants joined issue on the plaintiff's allegations that there were other letters than those filed and that they had been lost or destroyed. The predicate thus laid for the introduction of the secondary evidence not being sufficient, we dismiss the tes-

timony as to contents of those letters from our consideration. Elkhorn Land & Improvement Co. v. Wallace, 232 Ky. 741, 24 S. W. (2d) 560; Chilton's Adm'r v. Shelley, supra; Home Ins. Co. v. Westerfield, 266 Ky. 494, 99 S. W. (2d) 464.

Obviously, appellee concedes the incompetency of the plaintiff's evidence concerning his transaction with his dead sister and his actions based upon them.

We are relegated to her letters. These are "chatty" letters, but each is solicitous of her brother's welfare and contains words of encouragement. They speak of gratitude for the goodness of Providence to her and of an appreciation of her ability to be of comfort and assistance to others in a limited way. Throughout the letters runs a thread of wish that she and her brother could be together or closer to one another. We extract from some of them clauses and statements which may be said to be offers to her brother. The first letter of June 14, 1928, was written after Mr. Suter's return from his visit. Addressing his wife, Mrs. Parker wrote:

"Mamie, you make him come back here it is the thing for him to do while we are living one thing I am sorry I did not mention while he was here but will later I wish he could sell out before another year, then I could make things different. * * * Bob could do so much for me and I could do all for him."

About a month later she wrote:

"Oh how I wish you were footloose to come to me but some ties are binding. I am so sorry you have them I wish we could see each other every day we could get much out of life."

In September she acknowledged receipt of a letter from her brother in which his despair and discouragement are reflected. She stated her belief that conditions would be better after the election, and continued:

"Take this year to wind up your business at that end of the line for then you must come here. Sell what you have for what you can get loosen all the strings there I may find something here am busy looking but just so you have a home and a good living that means happiness. Just take it easy all will come our way. I will help you drive the wedge."

To develop the situation in sequence, we refer to a transaction of much significance which occurred at this time. So far the correspondence has not indicated any suggestion of a definite offer. Mrs. Parker had Judge Thomas B. McGregor prepare for her two deeds which she executed and acknowledged and left with him to hold until her death. One deed was to Robert H. Suter and the other to Mrs. Bridges. Judge McGregor had the impression that she was conveying all her property in the Peak's Mill community where her farms were. She said nothing about any contract, and he recalls that she simply wanted to give the grantees the property that way instead of by will. She stated that her husband always had an idea that a deed could not be set aside but a will could be broken. According to Judge McGregor's recollection Mrs. Parker called for and obtained these deeds from him two or three years later. Being presented with a deed to Mrs. Bridges of the Hockensmith farm, bearing date of September 29, 1928, and recorded after Mrs. Parker's death, he related that the other deed was like that except as to the property. He is positive the deeds were not pre-dated to May, 1928. Judge McGregor prepared a will for her on the same day. Its contents are unknown except as reflected in one of Mrs. Parker's letters. Her husband had used the method of executing a deed, delivered upon his death, to transfer the title to these lands to his wife. Within a few days Mrs. Parker wrote her brother:

"Bobbie I willed you the Hannen and Smith farm at my death but I thought it over carefully I left it as a sale at the winding up of my estate you pay last payment stated in will $1500.00 one thousand left you as the other brothers same to Mr. Parker Brother gave no more to mine than his one had done as much as the other as you know, you and Phronia will find your deeds in T. B. McGregor's office in his safe. My will in my box so dont worry about things I had rather be sick suffering pain for medicine will sometimes relieve that. Now Bobbie I have rented all out for this coming year they had to know on account of wheat sowing of which they are about done. So I think next fall will be about time to come then you can stay with me till spring and can make arrangements by the spring for getting some cows and chickens and what we may think best by that time

you can settle your Texas property for you will need some money to start up on and the election will be over and things better or worse. Now don't you think that the best thing to do. I have had a fight of things the last few weeks studying things for the best you know how to sympathize with me, so far as John is concerned no business of his what I do and I think he thinks I know it too, so he is cool and calm that is the reason I gave in the way of a sale dated May 28 the time you were here. I think sometimes I am a sort of a wonder I can not bear in your old days no home, so if you should need anything let me know I will remember you between now and Xmas, write if you are satisfied with what I have done if anything should happen to me come and look after your interest and be with Phronia in hers and you and Laura will fight for her."

There is pinned to the original of this letter a portion of another sheet of writing paper, different in size and texture, containing the following:

"Bobbie you spoke of the third party in my deeds Who is that third party, it is directly made to you, you simply ask Mr. McGregor for the deed he hands it directly to you, you record it yourself the worst thing in this get through that Bankruptcy as soon as possible there is no danger in my deeds no third party to them but write and tell me who it is dont fail to do that. Let me hear from you soon rush your Bankruptcy it means lots to be changing things of this nature your deed is dated May 18, 1928. I feel it should be in the Bank."

We find no explanation of this. Its contents and form indicate it was a portion of a later letter. This principal letter is the strongest document in the record tending to support the plaintiff's contention that there was a contract. Why Mrs. Parker advised that the deed was dated May 18, 1928, is a matter of conjecture, for, as stated, according to Judge McGregor's recollection the deed was written September 29, 1928, and dated that day.

On December 16th following, Mrs. Parker wrote, in connection with sending her brother a "little check" to be used as he and his wife wished, that she was happy to know that he was coming, and admonished him not

to "worry about things for you are provided for in old age and now too so far as that is concerned." On January 18, 1929, she wrote:

"Well I am sorry you are having such a time but guess that is the only way out of such things rest assured I will go to the bank in the morning and get the deed as requested now Bobbie remember if anything should happen to me you would be without a home that will never do to battle old age without a home, how long will you be disposing of this case when are you coming straight to Ky to live how are you disposing of home there.

"You are absolutely doing nothing of any consequence there I think you had about as well come to us and we will look up something here, what do you just want me to hold the deed it seems as though it will be void dated as it is write me just what you want me to do rush the case as it can not be dated until after that time I am so sorry you are having so many worries go right ahead I will have it in my possession after 11 o'clock the 19th day of this month which is in the morning."

Judge McGregor testified that a short while after the deeds were executed, Mrs. Parker called to inquire as to the sufficiency of the deed to pass title. She had with her a letter "written by some lady, who was a lawyer," which, however, he did not read. She also asked if the brother should go through bankruptcy would the conveyance have to go into the bankrupt estate. She was assured that title would not pass until her death and that it would not be involved in the bankruptcy proceeding. This is in harmony with the testimony of Miss Mary K. Suter that she suggested to her father there might be some complications on this account. But it is not in harmony with a letter in which Mrs. Parker told her brother that she would "go to the bank in the morning and get the deed as requested". On February 6, 1929, she wrote a long letter assuring her brother of the sufficiency of the deed and that all he had to do was to get it from Judge McGregor. She says, however:

"I have it here now. Ought to be with Phronia's in Mr. McGregor's box at the bank, and as I told you it is dated May 18, 1928."

Again there was assurance that the transaction would

not be affected by his bankruptcy. It is to be observed that it was on February 8, 1929, two days after this letter was written, that Suter filed his petition in bankruptcy and this deed of conveyance was not mentioned in his schedule of assets. On October 5, 1929, she supposed that her brother would be coming the last of the month, and, as stated, he did come the first of November.

As corroborative of a claim of contract, the plaintiff introduced the testimony of several neighbors and kinsmen to the effect that Mrs. Parker had said that she had written her brother to come home to attend to her business and that she had plenty for both and would leave him well fixed. After he had come she expressed relief in having him here and the privilege of intrusting her business to him.

We may look, briefly, to the plaintiff's situation as throwing light on the question of contract or no contract.

As related, he had been the victim of several misfortunes. On February 3, 1928, suit was filed to foreclose the mortgage on his farm. This was before his trip to Kentucky. He had offered to turn it over to his creditors and get the release from his debt, but his offer was declined. The lien on his town residence was for $2,060 and interest. There had been no decree for the sale of the farm nor, as we understand, any proceeding taken to enforce the mortgage on the town property when he went into bankruptcy. The trustee in bankruptcy, however, disclaimed interest in these properties as burdensome. The farm was sold under decree in April, 1929, to the mortgagee for the debt thereon amounting to $16,890. On October 29, 1929, Suter sold his residence for $2,700, which was but little more than the mortgage on it. He had some other property of little value, but seems to have owed not much more than the two lien debts. All of these facts, it seems to us, outweigh the estimates of value put upon his property by resident witnesses, who also expressed the opinion that if the sales had not been forced the sums realized would have been much more. This, of course, is to show that the going into bankruptcy and closing out in that manner resulted in a sacrifice. It is this detriment to Suter as a promisee, coupled with his offer of employment to manage his sister's farms and business affairs,

that form the asserted consideration for her promise to give him the farms.

We discard as incompetent, because self-serving in nature and effect, the written and verbal statements subsequently made by Mrs. Parker indicating there was no contract such as the plaintiff asserts, or that she had repudiated a voluntary agreement because of dissatisfaction. Benge's Adm'r v. Fouts, 174 Ky. 654, 192 S. W. 703; Bean's Adm'r v. Bean, 216 Ky. 95, 287 S. W. 239.

It does appear that at some time before Mrs. Parker's death a degree of friction developed. It may be implied that this arose over what she construed as the assumption of too much authority by her brother, and perhaps some irritation by her sister-in-law.

Mrs. Parker executed her last will on July 31, 1934, less than three months before she died. She devised to her brother Robert one-half her stock and crops, giving the other to Sophronia Bridges, and "for a cause," as she said, left him only a life estate in the Smith Farm of 40 acres with the remainder over to her nieces, Laura Suter and Emma Martin, to whom she devised also the Hannen Farm absolutely.

That there was a broken promise and keen disappointment is certain. That there was a breach of faith is possible, justified withal by the sister's conscience in having done much for her impoverished brother. Doubtless she felt she had not made any binding bargain and had the right to change her mind and will. The will was contested but sustained. This suit on the alleged contract was instituted after the loss of that contest, in which, as we understand, Robert Suter was quite active. During the pendency of the contest proceedings he had made no claim of a contract, which in itself is significant.

With his disappointment and her breach of faith, if any there was, we are not judicially concerned. The problem posed here is whether there was proof of a contract, "strong and conclusive." Was the bankruptcy liquidation, the winding up of his affairs in Arkansas and the migration to Kentucky at the instigation of or on the sister's proposal that she might profit thereby? Did the brother suffer any detriment thereby? We do not read the record as showing either consideration

clearly or convincingly. The making of the deed has some significance affirmatively and negatively. Affirmatively, the instrument and its course are consistent with the promise as the brother understood it. Negatively, the deed was not a conveyance, for it lacked the essential element of legal delivery. It was not deposited with Judge McGregor as an escrow for he was but her agent, and it could be, as it was, recalled. Watson v. Chandler, 133 Ky. 757, 119 S. W. 186; Home Insurance Company v. Wilson, 210 Ky. 237, 275 S. W. 691. The implication from the correspondence is clear that the deed was withdrawn at the brother's instance for fear of involvement in his bankruptcy proceedings. Had there been a contract as claimed, the deed and its course would likely have been made irrevocable, except possibly upon the breach of some consistent condition. Instead, the method pursued was testamentary clearly, and the beneficiary so understood. And understanding that, he is chargeable with knowledge that it was revocable. He did not claim title as an asset. To be sure a contract to devise, supported by a consideration, may be an enforcible one. The point is that the insecurity of this promise and transaction weakens the claim of a binding obligation on the promisor's part, and of reliance thereon by the promisee.

Do we not have a miniature of an ancient Biblical drama? When Joseph sent for his brothers and father to come from the famished land of Canaan to the fertile valleys of Egypt, and they had come, could Reuben or Benjamin, under modern jurisprudence, have maintained a suit for specific performance had Joseph failed in every respect to give them the land of Goshen? We doubt it.

We must declare our opinion that the plaintiff failed to establish that this offer was other than gratuitous for the purpose of helping the brother, and that his acceptance constituted any detriment; in short, that the evidence is lacking in sufficient weight to establish a binding contract. We think the chancellor should have so adjudged.

Judgment reversed.