MARCH 10, 2017; 10:00 A.M. Rehearing Denied June 2, 2017 Discretionary Review Denied by Supreme Court March 14, 2018
BRIEFS FOR APPELLANTS: Gary R. Adams, Daniel J. Canon, Louisville, Kentucky
ORAL ARGUMENT FOR APPELLANTS: Daniel J. Canon, Louisville, Kentucky
BRIEF FOR APPELLEE: Michael M. Hirn, Anthony M. Zelli, Louisville, Kentucky
ORAL ARGUMENT FOR APPELLEE: Michael M. Hirn, Louisville, Kentucky
BEFORE: ACREE, CLAYTON AND JONES, JUDGES.
OPINION
ACREE, JUDGE.
Louis Kaufman and Alph C. Kaufman, Inc. (ACK) appeal the August 13, 2013 judgment of the Jefferson Circuit Court entered upon a jury's verdict finding them liable for misappropriating trade secrets, interfering with existing or prospective business relationships, conversion, breach of contract, breach of fiduciary duty, and fraud, and ordering them to pay $2,003,715.12 in damages to the plaintiff, appellee Cornerstone Industries Corporation.
Two of the claims for which the jury found the Appellants liable were pleaded in the alternative-the contract breach claim and the claim for fraud. Both claims hinged on the same factual question: did Jeff Roby enter into a non-compete agreement with Cornerstone, or did he not. If he did, the contract claim had viability; if he did not, the fraud claim, as pleaded, had viability. The jury ruled in favor of Appellee on both claims after concluding Roby had executed a non-compete agreement for purposes of the contract breach claim, but that he had not executed a non-compete agreement for purposes of the fraud claim. The verdict is thus inconsistent.
With regard to verdicts on claims for which Appellants' liability was premised on the existence or non-existence of the non-compete agreement, we reverse the judgment and remand for a new trial on liability. With regard to verdicts on claims that were unaffected by the existence or non-existence of the agreement, we affirm as to liability. However, on remand and retrial of these certain claims, the circuit court shall instruct the jury that damages must be re-allocated among any and all claims on which Appellants are found liable.
FACTS AND PROCEDURE
For over a decade beginning in 1994, Louis Kaufman and Dan Hess co-owned Cornerstone, an industrial flooring company. From the start, Kaufman served as the company's president.
Near the end of Kaufman's tenure with Cornerstone, the company began to experience loss. In April of 2004, Cornerstone held a special meeting of its Board of Directors. The meeting minutes reflect that Cornerstone had suffered a near one-million dollar loss in 2003, and Kaufman *808 was "looking to an exit strategy for his shareholder interest" in Cornerstone. Hess agreed to acquire Kaufman's shares and to release Kaufman from certain guaranty obligations.
Following the April 2004 meeting, Cornerstone centralized its operations in Indianapolis, Indiana. This process involved transferring numerous documents from Louisville, Kentucky, to Indianapolis. Kaufman also relinquished to Hess all control over Cornerstone's day-to-day operations, with one notable exception: Hess was prohibited from terminating the employment of two Cornerstone employees, one of whom was Jeff Roby.
Roby, a Cornerstone salesman, was hired in 1994. He worked out of Cornerstone's Louisville office and reported directly to Kaufman. By all accounts, Roby was a skilled salesman and valuable Cornerstone employee who generated approximately $1,000,000.00 in gross sales revenue in 2005 and again in 2006; between 30% and 40% of that sum was Cornerstone's profit.
Kaufman and Hess finalized their stock sale in April 2005 when Kaufman officially left Cornerstone. For two years following his departure, and in accordance with the non-compete provision of the stock sale agreement, Kaufman did not engage in the industrial flooring business. When the term of that provision expired, Kaufman began employment with his own family's industrial flooring company, ACK.
In need of employees for ACK, Kaufman contacted Roby. The two communicated extensively. In June 2007, while still employed by Cornerstone, Roby began emailing Cornerstone forms and documents to his personal email account. These included, for example, form templates for bidding and actual bids submitted on behalf of Cornerstone to: Multi-Color Corporation; SNL Enterprise, Inc.; Fruit of the Loom; Glenn Buick GMC Hyundai; Oldcastle Glass; and Messer Construction. Roby continued this practice for several months.
On October 18, 2007, Kaufman, through his attorney, sent Cornerstone a letter expressing his intention to make Roby an employee of ACK. Cornerstone claims it had become aware that Roby was already committed to working for ACK and responded to Kaufman's inquiry, through counsel, by letter dated October 26, 2007, stating, in part:
As I am sure you were aware, Alph C. Kaufman and Louis A. Kaufman were shareholders in Cornerstone. Also, Louis A. Kaufman was chief executive officer and employed by Cornerstone. Until such time as the relationship between Mr. Kaufman and Cornerstone was terminated, all corporate records were maintained in Louisville at the offices of Mr. Kaufman and/or Alph C. Kaufman, Inc. Mr. Roby also worked out of these same premises. It is Cornerstone's belief that Mr. Kaufman required Mr. Roby to execute an employment agreement which contained a non-competition provision and which was in favor of Cornerstone. In addition, there are other concerns. Accordingly, I would respectfully request you direct the following inquires to Mr. Roby and Mr. Kaufman and let me have their responses:
Please advise as to whether Mr. Roby ever executed an employment/non-competition agreement in favor of Cornerstone.
(Plaintiff's Exhibit 31). According to Cornerstone, the belief that Roby was subject to a non-competition provision was based on representations Kaufman made to Cornerstone employees.
Apparently without responding to this inquiry, Roby officially resigned from Cornerstone on November 1, 2007, and began work with ACK four days later in a position that required that he act as a salesman *809 in business pursuits that directly competed with those of Cornerstone. Indeed, shortly after joining ACK, Roby submitted bids on behalf of ACK to jobs on which Cornerstone had previously bid. The ACK bids were virtually identical to the Cornerstone bids. For example, on July 11, 2007, Roby, on behalf of Cornerstone, submitted a $19,885.00 bid to Fruit of the Loom for floor work in the "compactor area." On December 5, 2007, Roby, on behalf of ACK, submitted an $18,985.00 bid to Fruit of the Loom for the same scope of work. The ACK bid utilized the same headings and boilerplate language as the Cornerstone bid.
Cornerstone filed suit on November 5, 2007, against Roby alleging breach of fiduciary duty, violation of uniform trade secrets act, and interference with prospective contractual relations.[1] First and second amended complaints were filed in 2008 and 2009, respectively, adding ACK and Kaufman, individually, as defendants and adding a host of additional allegations, including:
(1) against ACK only: aiding and abetting Roby's breach of fiduciary duty;
(2) against Kaufman, only: conversion and breach of contract related to the stock sale agreement which required Kaufman to turn over all Cornerstone business records;
(3) against ACK and Kaufman: interference with prospective contractual relations; violation of uniform trade secrets act; tortious interference with contractual relations; aiding and abetting breach of non-competition covenants; and aiding and abetting breach of confidentiality covenants.
(4) against Roby, only: breach of contract related to his alleged non-competition agreement.
Cornerstone amended its complaint two more times over the course of the underlying litigation. These subsequent amended complaints added claims of fraud and breach of fiduciary duty against Kaufman. Each claim was "pled in the alternative." (R. 221, 311). As to fraud, Cornerstone stated in its third amended complaint: "As an alternative claim, Cornerstone alleges that, if there is no valid and enforceable non-competition agreement signed by Roby, Louis Kaufman's statement that he had such an executed agreement [by Roby] was false." (R. at 221). Further, the breach of fiduciary duty count alleged that Kaufman, while acting as an officer of Cornerstone, owed a fiduciary duty to Cornerstone and that Kaufman's "failure to secure and maintain a confidentiality and noncompetition agreement from Roby and the failure to turn over that agreement upon his departure constituted a breach of his fiduciary duty which caused harm to Cornerstone." (R. at 311).
After Appellants' 2012 pursuit of summary judgment proved unsuccessful, a nine-day jury trial was held to resolve all claims. At trial, the factual issue of Roby's alleged non-compete agreement took center stage. Cornerstone was unable to produce Roby's non-competition agreement. Cornerstone argued that it was prevented from presenting that crucial evidence because Kaufman either failed to procure one from Roby in the first place or, having procured it, failed to turn it over to Cornerstone. Appellees claimed Roby never signed a non-competition agreement. However, Cornerstone presented evidence that was intended to support its claim that the non-compete provision existed and the substance of its terms.
Kaufman himself testified that, during his time as president of Cornerstone, it *810 was Cornerstone's policy that all sales people were required to sign non-competition agreements. Kaufman was president at the time Roby was hired in 1994. Hess echoed Kaufman's testimony. Cornerstone also admitted into evidence a letter dated July 18, 1996, authored by Kaufman, stating: "Cornerstone requires a non-compete agreement for its field sales force hires." (Plaintiff's Trial Exhibit 1). Additionally, Hess stated Kaufman created Cornerstone's standard non-competition agreement and Kaufman was responsible for obtaining a noncompetition agreement from each sales employee hire, including Roby. Hess further testified that he specifically asked Kaufman at or around the April 2004 meeting if Roby had a non-competition agreement with Cornerstone. Kaufman replied in the affirmative. Jill Crosby, Cornerstone's office manager, testified she also asked Kaufman for Roby's non-compete agreement, to which Kaufman acknowledged that, "Yes, I have it," but claimed it was in his safe at home and he would have to get it to Crosby at a later time. It was never produced.
As to the agreement's terms, Cornerstone produced multiple copies of its standard employee non-compete agreement signed by Kentucky sales employees between 2001 and 2003. Each non-compete agreement prevented the subject employee from engaging in a competing business in the same geographic area served by Cornerstone for a period of two years after the end of the employee's tenure with Cornerstone. Crosby testified that Cornerstone used this same non-compete form for a long time and Roby would have signed Cornerstone's standard non-competition agreement.
Cornerstone also claimed that Roby stole confidential trade secrets belonging to Cornerstone and used those secrets to solicit Cornerstone customers for ACK. At trial, Cornerstone's theory was that Roby misappropriated document templates, bid documents, and pricing information. Hess testified these documents were valuable and commercially sensitive, and Cornerstone had actively taken steps to keep the information secret. Roby admitted it could be detrimental to Cornerstone if its competitor had access to Cornerstone's bid documents.
After several days of testimony and evidence, the jury retired to deliberate on ten separate claims by Cornerstone and a breach of contract counterclaim by Kaufman against Cornerstone.
The jury returned a verdict in favor of Cornerstone on all counts; it found no liability on Kaufman's counterclaim against Cornerstone. However, the jurors had not signed the forms-the foreperson had simply hand-printed the name of each juror who had agreed to the verdict on the signature lines.[2] The circuit court sent the jury back to redo the forms.
The jury returned a half hour later with a verdict of $1,650,976.26 for each and every claim. This included an award of the same amount on Kaufman's counterclaim even though the jury had found no liability on that claim. The circuit judge read the verdict aloud, and asked the foreperson if it was correct; the foreperson admitted she made a typographical error. Appellants moved for a mistrial based on the numerous irregularities up to that point. The circuit court denied the motion. The circuit judge then polled the jury; each juror answered "no" when asked if that was his or her verdict. Two jurors addressed the court:
Juror 882782: We used that amount and divided it by twelve, thinking they were gonna get it in maybe a twelve month period or something. I think that we *811 called for instructions and we were unclear about how we should answer that. I think that amount was the total amount that we wanted, right?
Unidentified Juror: Uh-uh (negative).
Juror 882782: It wasn't? Okay then, I don't know. That's what I thought.
Circuit Court: Okay, but did you intend to award $1,650,976.26? [3 ]
Juror 882782: I think totally I did. But not for twelve-twelve times. I think-I don't remember the amount that we divided by twelve. We took a million and something and divided by twelve and came up with that hundred and some-odd thousand dollars....
Unidentified Juror: That's not the number.
The jury was sent back yet again with yet another damages form. When they returned this time, the jurors had written $165,976.26 on each of the ten lines awarding damages to Cornerstone.[4] The circuit court again polled the jury. Each juror answered "yes" when asked if this was his or her verdict.
The circuit court entered a final judgment against Appellants consistent with the jury's verdict on August 13, 2013.[5]
Appellants filed numerous post-trial motions, including motions: for judgment notwithstanding the verdict; to alter, amend or vacate the judgment; for remittitur; for reduction of post-judgment interest rate; and for a second judgment notwithstanding the verdict. The circuit court summarily denied all of them. This appeal followed.
Appellants present four primary arguments, each containing multiple sub-parts, for our consideration. Those are: (1) Cornerstone's claims regarding Roby's non-competition agreement are unsupportable as a matter of law and fact; (2) the jury received improper instructions; (3) the jury's verdict is erroneous and materially inconsistent; and (4) the circuit court erred in not granting a directed verdict in favor Appellants related to Cornerstone's trade secrets and tortious interference claims.
STANDARDS OF REVIEW
We examine legal questions de novo . Ragland v. DiGiuro , 352 S.W.3d 908, 912 (Ky. App. 2010) ("Questions of law are reviewed de novo by an appellate court."). Claimed errors regarding jury instructions are questions of law. Leighton v. CSX Transp., Inc. , 338 S.W.3d 818, 822 (Ky. App. 2011). Further, "[w]hen reviewing a jury verdict, the appellate court is restricted to determining whether the trial judge erred in failing to grant a motion for directed verdict." Denzik v. Denzik , 197 S.W.3d 108, 110 (Ky. 2006). We review a trial court's refusal to direct a verdict under a clear error standard. Toler v. Süd-Chemie, Inc. , 458 S.W.3d 276, 285 (Ky. 2014) (footnote omitted).
ANALYSIS
A. Non-Competition Agreement
ACK first argues that the jury's verdict as to the breach of contract claim should be reversed because there was insufficient *812 evidence to support the factual findings regarding: (1) the existence of Roby's non-compete agreement; (2) the duration and geographic limitations of the restrictive covenant; and (3) the consideration supporting such an agreement. They also argue the statute of frauds should have prevented testimony regarding the agreement.
Before proceeding, we note that, as discussed in detail below, the jury's several verdicts first disagreed with all these arguments, but then agreed with the first of these, that the agreement did not exist. The jury found, in essence, the non-compete agreement both existed and did not exist, resulting in inconsistent verdicts.
However, even a finding of inconsistent verdicts would not render the arguments presented here moot. If Appellants persuade this Court, either as a matter of law or fact, that the record does not support a finding that the non-compete agreement ever existed (reversing judgment on the breach of the non-compete agreement claim only), the inconsistency would be eliminated.
Therefore, we must analyze these arguments to test that possibility. When we do so, we are not persuaded by any of these arguments.
(i.) Existence of the non-compete provision
Cornerstone based claims against the Appellants on an employment agreement which could not be produced as evidence. "Whether the asserted writing ever existed [is an issue] for the trier of fact to determine as in the case of other issues of fact." KRE [6] 1008(a). As the proponent of the existence of the document, it was Cornerstone's burden to prove. CR [7] 43.01(1).
The quantum of proof necessary to establish the existence of a document that cannot be produced as evidence has been cogently expressed by our brethren on the federal court, describing Kentucky law as requiring "that the evidence necessary to establish a lost writing 'must be clear and satisfactory.' " BDT Prods., Inc. v. Lexmark Int'l., Inc. , 274 F.Supp.2d 880, 895-96 (E.D. Ky. 2003) (quoting Suter v. Suter , 278 Ky. 403, 128 S.W.2d 704, 706 (1939) ). Our own high court has approvingly quoted the early decision of the United States Supreme Court in Tayloe v. Riggs on the same subject:
When a written contract is to be proved, not by itself but by parol testimony, no vague uncertain recollection concerning its stipulations ought to supply the place of the written instrument itself. The substance of the agreement ought to be proved satisfactorily; and if that cannot be done, the party is in the condition of every other suitor in Court, who makes a claim he cannot support. When parties reduce their contract to writing, the obligations and rights of each are described, and limited by the instrument itself. The safety which is expected from them, would be much impaired, if they could be established upon uncertain and vague impressions made by a conversation antecedent to the reduction of the agreement.
Arrington v. Sizemore , 241 Ky. 171, 43 S.W.2d 699, 704 (1931) (quoting Tayloe v. Riggs , 26 U.S. (1 Pet.) 591, 600, 7 L.Ed. 275 (1828) ; internal quotation marks omitted).
This Court has also explained that the "clear and convincing" standard "does not mean that it must be established beyond a reasonable doubt, but that the evidence must not be vague, ambiguous, or contradictory, and must come from a credible source. It does not have to be undisputed *813 or uncontradicted." Wehr Constructors, Inc. v. Steel Fabricators, Inc. , 769 S.W.2d 51, 54 (Ky. App. 1988) (citing Glass v. Bryant , 302 Ky. 236, 194 S.W.2d 390 (1946) ). Guided by these cases, we consider the evidence of the existence of the non-compete agreement. We conclude that Cornerstone presented sufficient evidence to convince the trier of fact that the non-competition agreement existed.
A 1996 document authored by Kaufman and part of Cornerstone's business records was admitted into evidence indicating that a company policy was then in place that "Cornerstone requires a non-compete agreement for its field sales force hires." While testifying, Kaufman was asked who he recalled signing non-competition agreements; he answered that "[t]he sales people who were hired subsequent to Jill Crosby's employment with Cornerstone." Crosby had previously testified that Roby was hired as a sales person subsequent to her employment with Cornerstone. Furthermore, testimony was admitted from both Hess and Crosby that Kaufman expressly stated to each of them that he was in possession of Roby's non-competition agreement and kept it in his safe. Although circumstantial in nature, this evidence is sufficient to support the jury's finding of the existence of a non-competition agreement between Roby and Cornerstone.
(ii.) Consideration supporting the non-compete provision
Without conceding the existence of the non-compete agreement, ACK argues that any such agreement is unenforceable as lacking consideration. To support this contention, ACK places great reliance on our Supreme Court's recent opinion in Charles T. Creech, Inc. v. Brown , 433 S.W.3d 345 (Ky. 2014). For the following reasons, we conclude that Creech is inapplicable here.
Non-competition agreements fall into one of two general categories. In the first category are those which were entered into at the time of employment. "[W]hen the employee executes the covenant not to compete at the same time he accepts employment, the latter becomes the consideration for the covenant [.]" Ferdinand S. Tinio, Annotation, Sufficiency of consideration for employee's covenant not to compete, entered into after inception of employment , 51 A.L.R.3d 825 § 2[a] (Originally published in 1973).
In the second category we find non-compete agreements that were entered into subsequent to the employment. These have come to be known as "afterthought agreements." Jordan Leibman & Richard Nathan, The Enforceability of Post-Employment Noncompetition Agreements Formed After At-Will Employment Has Commenced: The "Afterthought" Agreement , 60 S. Cal. L. Rev. 1465, 1472 (1987).
Appellants claim it is "undisputed that Roby was not obligated to sign a noncompete agreement when he was first hired at Cornerstone." (Appellant's Brief, p. 2). Cornerstone does not appear to share Appellants' view. It points out that Cornerstone's policy was for new hires to sign non-competition agreements and the testimony at trial established this policy was in place when Roby was hired in 1994. The evidence is substantial that would point to the non-compete being entered into at the time of Roby's employment and the consideration would be the employment itself.
However, even if we presume the non-compete was executed at a time other than concurrently with employment, Creech would indicate that the consideration Roby received was "specialized knowledge, training, and expertise [he] would not have otherwise acquired." Charles T. Creech, Inc. v. Brown , 433 S.W.3d 345, 354 (Ky. 2014). Roby testified himself that he had *814 no experience in the flooring business before working at Cornerstone. This fact is significant to the consideration equation.
Consideration for a contract can be either "a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." Phillips v. Phillips , 294 Ky. 323, 171 S.W.2d 458, 464 (1943) (quoting Luigart v. Fed. Parquatry Mfg. Co. , 194 Ky. 213, 238 S.W. 758, 760 (1922) ). Kentucky courts also have defined consideration as "the reason which moves contracting parties to enter into [an] undertaking." Cassinelli v. Stacy , 238 Ky. 827, 38 S.W.2d 980, 983 (1931).
We conclude that no matter when Roby executed a non-compete (presuming he ever did), there was evidentiary support for finding that it was supported by consideration. Accordingly, we decline to vacate the jury's verdicts related to the non-competition agreement on the ground of lack of consideration.
(iii.) Terms of the non-compete provision
Evidence also exists regarding the terms of Roby's agreement. Cornerstone admitted into evidence its standard non-competition agreement. Crosby testified Roby would have signed such an agreement. That agreement included a two-year duration and limited the geographical scope to states in which Cornerstone sold or installed its products. Again, the jurors having concluded that a non-compete agreement between Roby and Cornerstone existed, and that when Roby was hired all new sales hires entered into a form non-compete agreement, it was reasonable for them to infer the terms of Roby's non-compete agreement from the evidence presented.
(iv.) Statute of frauds
Appellants argue Roby's non-compete agreement fails because it was not in writing and therefore offends the statute of frauds. KRS 371.010 ("No action shall be brought to charge any person: ... (7) Upon any agreement that is not to be performed within one year from the making thereof ... unless the ... agreement ... be in writing[.]"). Appellants miss the point here. Cornerstone never argued or presented evidence that the agreement was oral; rather, it argued the agreement was in writing, but that it was lost. Kentucky's evidentiary rules and our common law contemplate the possibility of a party proving and enforcing the contents of a lost written contract by means other than producing the original contract or even a copy. KRE 1004 ; Suter v. Suter , 278 Ky. 403, 128 S.W.2d 704, 706 (1939) ("plaintiff relies upon a contract evidenced by correspondence, an important and possibly controlling part of which is undertaken to be proved by parol evidence as lost documents").
Specifically, KRE 1004 states, in pertinent part: "The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if ... [a]ll originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith[.]" And, when "an issue ... raised [by Appellants w]hether the asserted [non-competition agreement] ever existed [or w]hether other evidence of contents[, e.g., Hess's and Crosby's testimony and Cornerstone's standard non-competition agreement,] correctly reflects the contents [of Roby's non-competition agreement], the issue is for the trier of fact[, i.e., the jury] to determine as in the case of other issues of fact." KRE 1008(a), (c). The jury found convincing Cornerstone's evidence related to the existence and terms of Roby's non-competition agreement. They found that a written contract did exist. Thus, the statute of frauds is satisfied.
*815 In sum, Appellants have identified no grounds sufficient to disturb the jury's findings related to the terms and consideration for Roby's non-competition agreement. On this issue, we affirm.
B. Inconsistent Verdicts
Appellants contend the jury rendered inconsistent verdicts entitling them to a new trial under CR [8] 59.01.[9] Cornerstone's original complaint alleged breach of contract which is premised on proof that Roby did execute a non-compete agreement. Cornerstone presented two claims against Kaufman-fraud and breach of fiduciary duty-which are premised on a requisite finding of fact that Roby did not execute a non-competition agreement. Despite the jury's specific finding that there was a non-competition agreement that Roby breached, it also found in Cornerstone's favor on the fraud and breach of fiduciary duty claims against Kaufman. Appellants argue this resulted in inconsistent verdicts. We agree.
"Where a verdict is ambiguous, irregular or defective in form or in substance, a trial court has the power, indeed the duty when its attention is called to the verdict, to require the jury to reconsider and change its verdict whether or not the court is requested to do so." Anderson's Ex'x v. Hockensmith , 322 S.W.2d 489, 490 (Ky. 1959). Further, "the vice in the verdict is more than formal" and "affects the merits of the case" when the verdict "is so uncertain, ambiguous, contradictory, or illogical that it cannot be clearly ascertained ... what facts were found and the court cannot reasonably construe the language so as to give effect to what the jury unmistakably found as a basis of a judgment thereon ...." Id. at 490-91.
It is well-known that, in this Commonwealth, a pleading may assert alternative or inconsistent theories. CR 8.05 ; Smith v. Isaacs , 777 S.W.2d 912, 915 (Ky. 1989). "A plaintiff is the master of his own complaint, and is thus entitled to plead his cause of action among alternative causes of action as he deems best to pursue his litigation objectives." Whitley v. Robertson County , 406 S.W.3d 11, 17 (Ky. 2013). Alternative claims necessarily give birth to alternative jury instructions. Carefully crafted instructions ensure a jury does not find in favor of the plaintiff on inconsistent claims. See id.
Cornerstone pleaded fraud and breach of fiduciary duty against Kaufman as an alternative to the contract breach claim. This pleading structure has meaning. Its effect is most easily demonstrated by way of an if/then statement: if the jury finds Roby did not have a non-competition agreement, the contract breach claim must fail, but then the jury should consider Cornerstone's fraud and breach of fiduciary duty claims against Kaufman which were dependent upon the non-existence of a contract.
Here, the jury specifically found under Instruction 8 (Cornerstone's Breach of Contract claim against Roby) "[t]he existence of a valid [non-competition] contract between Cornerstone and Roby" and that Roby breached that agreement. (R. at 934, 952). However, it also found in favor of Cornerstone as to its fraud claim against Kaufman under Instruction 11. (R. at 956). That instruction stated, in part: "Cornerstone *816 claims that, if it is found that Defendant Roby did not have or breach his employment contract with Cornerstone , that Kaufman is liable for fraud." (R. at 937). Plainly put, the jury found a non-competition agreement existed under instruction 8, but subsequently found no such agreement existed under instruction 11. The verdict is inconsistent and cannot be reconciled.
The jury further found Kaufman breached his fiduciary duty to Cornerstone under instruction 13 when he failed to "secure and maintain a confidentiality and noncompetition agreement from Roby." (R. at 933, 957). This count, like the fraud count, was pleaded in the alternative and at least partially contemplated the non-existence of a non-compete agreement between Roby and Cornerstone.
We cannot deduce from the jury's verdict whether it believed in, and found as fact, the existence or non-existence of a non-competition agreement. The verdict is therefore "uncertain, ambiguous, contradictory, [and] illogical." Hockensmith , 322 S.W.2d at 490. Accordingly, we vacate the August 13, 2013 final judgment and remand for a new trial on all claims related to Roby's non-competition agreement, including the following claims by Cornerstone against Kaufman and ACK as set forth in its fourth amended complaint: interference with contractual and prospective relations (count v); tortious interference with contractual relations (count viii);[10] aiding and abetting breach of non-competition covenants (count ix); aiding and abetting breach of confidentiality covenants (count x); breach of contract (count xi); conversion (count xii); fraud (count xiii); and breach of fiduciary duty (count xiv).[11]
Because we are reversing on these grounds, we need not address Appellants' other arguments related to the jury instructions.
C. Directed Verdict
Appellants next assert they were entitled to a directed verdict on two of Cornerstone's claims: misappropriation of trade secrets and tortious interference with prospective contractual relations.[12] They also argue the circuit court erred when it declined to find that Cornerstone waived all its claims against Kaufman in a prior settlement agreement. These claims have no relation to and do not turn on the existence or non-existence of Roby's non-competition agreement.[13] Accordingly, it is necessary to address Appellants' arguments.
(i.) Prior Settlement Agreement
Appellants argue Cornerstone waived in a settlement agreement executed on August 30, 2004, all known and unknown *817 claims it could have had against Kaufman, individually, arising prior to August, 2004, including its breach of contract, fraud, conversion, and breach of fiduciary duty claims. The pertinent section of that agreement, Cornerstone claims, is provision 3, which reads:
The Cornerstone Parties and each of them waive and release any and all claims or rights presently unknown (other than claims or rights arising out of this Settlement Agreement) that they may have against the Tectonic Parties and each of them.
Appellants assert Kaufman signed the release as one of the "Tectonics Parties." (Appellants' Brief, p.6). They misread the settlement agreement.
"An agreement to settle legal claims is essentially a contract subject to the rules of contract interpretation." Cantrell Supply, Inc. v. Liberty Mutual Insurance Co. , 94 S.W.3d 381, 384 (Ky. App. 2002). Contract interpretation is a legal question for the Court. Id.
We have carefully reviewed the settlement agreement at issue. It addresses separate litigation only peripherally related to the underlying case. In that agreement, Cornerstone, Hess, and Kaufman released all claims against the "Tectonics Parties." The agreement's introductory paragraph clearly defined the parties:
Settlement Agreement by and between Cornerstone Industries Corp., a Kentucky corporation, Tectonic Flooring Company, a Kentucky general partnership formerly known as "Cornerstone Flooring & Linings West, dba Tectonics Cornerstone West," Louis A. Kaufman, LLC, a Kentucky limited liability company, Daniel L. Hess, LLC, a Kentucky limited liability company, Louis A. Kaufman, an individual, Daniel L. Hess, an individual (collectively, "the Cornerstone Parties"), and Tectonics Engineering & Contracting, Inc., a California corporation, John Michael Heraty, and individual, Sean Heraty, an individual, and Michael Heraty, an individual (collectively, "the Tectonics Parties").
(Supplemental R. at 84). A plain reading of the agreement reveals Kaufman was a Cornerstone party, not a Tectonics party, and Kaufman signed the agreement as a Cornerstone party. There is no support for Appellants' contention that Kaufman signed the release as a Tectonics party. Further, the agreement contains no language suggesting Cornerstone intended to discharge liability for and waive all known and unknown claims it had against Kaufman. Appellants' interpretation of the settlement agreement cannot withstand scrutiny. We affirm the circuit court's June 19, 2013 order denying Appellants' motion to dismiss or for a directed verdict on Cornerstone's claims against Kaufman in his individual capacity.
(ii.) Trade Secrets
Appellants maintain they were entitled to a directed verdict on Cornerstone's claim that Appellants misappropriated Cornerstone's trade secrets in violation of the Kentucky Uniform Trade Secrets Act (KUTSA). KRS 365.880 et seq . They argue the trade secrets identified by Cornerstone-bid sheet templates and information regarding specific bids-do not constitute "trade secrets" under KRS 365.880. Even if such documents do constitute trade secrets, argue Appellants, they were not appropriately protected, nor were they misappropriated or used improperly in any way. We disagree.
The jury found Appellants misappropriated Cornerstone's trade secrets. A directed verdict is only appropriate when "there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds *818 could differ." Toler v. Süd-Chemie, Inc. , 458 S.W.3d 276, 285 (Ky. 2014) (footnote omitted). "Where there is conflicting evidence, it is the responsibility of the jury to determine and resolve such conflicts, as well as matters affecting the credibility of witnesses." Bierman v. Klapheke , 967 S.W.2d 16, 19 (Ky. 1998).
To demonstrate a violation of the KUTSA, the plaintiff must show that: (1) it had a trade secret; and (2) the defendant(s) misappropriated the trade secret. Auto Channel, Inc. v. Speedvision Network, LLC , 144 F.Supp.2d 784, 788 (W.D. Ky. 2001) ; Community Ties of America, Inc. v. NDT Care Services, LLC , No. 3:12-CV-00429-CRS, 2015 WL 520960, slip op. at 10 (W.D.Ky. Feb. 9, 2015). "In any analysis of this sort, no one factor is determinative. Every circumstance must be considered on its merits." Auto Channel , 144 F.Supp.2d at 795. We will discuss each element in turn.
A trade secret is information that derives independent economic value "from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and is the "subject of efforts that are reasonable under the circumstances to maintain its secrecy." KRS 365.880(4). Breaking this down further, to be considered a trade secret under the KUTSA, the information at issue must: (1) have independent economic value; (2) not be generally known or readily ascertainable by proper means; and (3) be the subject of reasonable efforts to maintain its secrecy. Id. ; BDT Products Inc. v. Lexmark Int'l, Inc. , 274 F.Supp.2d 880, 890 (E.D.Ky. 2003). "Whether a particular type of information constitutes a trade secret is a question of fact." Fastenal Co. v. Crawford , 609 F.Supp.2d 650, 672 (E.D.Ky. 2009).
Applying these principles here, Cornerstone claims its bid documents, bid preparation tools, and pricing information are trade secrets under the KUTSA. The jury agreed. Evidence presented at trial supports the jury's finding.
Hess testified the information at issue was valuable to Cornerstone and contained commercially-sensitive information not available to the public at large. In fact, Hess testified that only certain Cornerstone employees-primarily sales persons-had access to its bid documents. Cornerstone's bid form was developed by Cornerstone to help its sales associates determine the right complement of products to be used on a particular job. Roby admitted it would be detrimental to Cornerstone if its bid documents fell into a competitor's hands. Hess also testified Roby took digitized bid preparation documents, namely an active live Excel spreadsheet program document (not simply a paper form spreadsheet) used to calculate bid quotes. The Excel spreadsheet, developed by Cornerstone, contained formulas embedded in the program. It also contained Cornerstone's specific material costs and pricing information. Hess testified this information was valuable and confidential because it would allow a competitor to underbid Cornerstone and to negotiate favorable deals with Cornerstone's suppliers that would in turn allow the competition to match or narrowly beat Cornerstone's bids. Church Mut. Ins. Co. v. Smith , 3:14-CV-749-JHM, 2015 WL 3480656, at *4 (W.D. Ky. June 2, 2015) ("Trade secrets are valuable because they are secret-the secret information gives the user a competitive edge in a market for the very reason that the information is unknown to competitors.").
Cornerstone also submitted evidence indicating it made reasonable efforts to maintain the information's secrecy. Again, Kaufman testified it was standard practice for all sales personnel to sign non-competition *819 agreements. Hess also testified Cornerstone protected its trade secrets by password protecting computer access, restricting access to computer databases, and including with outgoing company emails a warning that transmitted information might contain confidential, trade secret information.
In light of this evidence, we cannot say it was unreasonable for the jury to conclude that the information at hand qualified as trade secrets under the KUTSA.
That takes us to the second element under the KUTSA-misappropriation. A defendant "misappropriate[s] a trade secret if [the defendant] used it without proper consent, if the trade secret was disclosed improperly, or if it was acquired through improper means." Fastenal Co. v. Crawford , 609 F.Supp.2d 650, 672 (E.D. Ky. 2009) (citation omitted). Cornerstone introduced evidence that Roby, while a Cornerstone employee and without authorization, accessed Cornerstone's password-protected servers and emailed confidential bid documents, bid preparation tools, and pricing information to his personal email account. Cornerstone also identified evidence indicating Roby used Cornerstone's proprietary information, without Cornerstone's permission, to construct bids on behalf of Kaufman and ACK to Cornerstone's detriment.
We are fully cognizant that Appellants submitted evidence at trial that seemingly countered Cornerstone's evidence. But ultimately we find Cornerstone presented substantial, competent evidence from which it was reasonable for the jury to conclude that the information at issue constituted trade secrets and that Roby, assisted by Kaufman and ACK, misappropriated those secrets. Accordingly, we cannot say there was a complete lack of proof on these material issues necessitating a directed verdict in Appellants' favor. We decline to disturb the jury's verdict on this issue. See Consolidated Infrastructure Mgmt. Auth., Inc. v. Allen , 269 S.W.3d 852, 856 (Ky. 2008) ("[T]rial court's ruling [denying directed verdict] will be overturned only where the jury's verdict is so flagrantly against the weight of the evidence as to indicate passion or prejudice[.]").
(iii.) Tortious Interference
Finally, Appellants argue they were entitled to a directed verdict on Cornerstone's tortious interference claim. Citing National Collegiate Athletic Association By and Through Bellarmine College v. Hornung , 754 S.W.2d 855 (Ky. 1988), Appellants argue there was inadequate evidence produced at trial that Appellants' interference was "improper and intentional." We are not persuaded.
"Under Kentucky law, liability for tortious interference arises when a party improperly interferes with a valid expectancy of another." Ventas, Inc. v. HCP, Inc. , 647 F.3d 291, 306 (6th Cir. 2011). In Horning , the Kentucky Supreme Court expressly adopted Section 776B of the Second Restatement of Torts. 754 S.W.2d at 857. That section describes the basic elements of a tortious interference claim:
One who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.
Restatement (Second) of Torts § 766B (emphasis added).
The Supreme Court further elucidated in Horning that "improper interference" under § 766B requires the plaintiff *820 to "show malice or some significantly wrongful conduct." 754 S.W.2d at 859. Within the framework of the tort of intentional interference, the term "malice is not malice in the sense of ill will but merely 'intentional interference without justification.' " Id. (citation omitted). Accordingly, "malice may be inferred in an interference action by proof of lack of justification." Id. Likewise, "significantly wrongful conduct" includes fraudulent misrepresentation, deceit, and coercion. Steelvest, Inc. v. Scansteel Serv. Ctr., Inc. , 807 S.W.2d 476, 487 (Ky. 1991).
In the case before us, Cornerstone presented evidence that Kaufman intentionally sought to lure Roby from Cornerstone to ACK, to take advantage of Roby's knowledge of Cornerstone's clients and potential clients, specifically to position ACK to compete with Cornerstone's business. There was also evidence that Roby and Kaufman purposefully conspired to misappropriate and divert business opportunities from Cornerstone to ACK. Together, Kaufman and Roby achieved this end by misappropriating Cornerstone bid documents and then submitting competing, lower bids to multiple potential Cornerstone clients.
Ultimately, the findings of the jury will be sustained on appeal "if there was competent and relevant evidence affording a reasonable and logical inference or conclusion of a definite fact ...." Beatrice Foods Co. v. Chatham , 371 S.W.2d 17, 19 (Ky. 1963). In this case, we find ample evidence in the record from which the jury could conclude that Appellants intentionally and improperly interfered with Cornerstone's prospective contractual and business relationships. On this issue, we also affirm.
D. Damages
As a necessary consequence of reversing the inconsistent verdicts of liability on part of the claims, the jury's award of damages as to all claims must also be reversed to allow allocation of damages among the various claims after retrial of the claims identified in section B, supra . This Court cannot know whether, upon retrial, the allocation of compensatory damages among the various counts will still be just, proper or equitable in the minds of the jurors. Furthermore, because a punitive damage award is allowable relative to less than all the claims affected by the inconsistent verdicts, we must also reverse the punitive damages award. This ruling regarding damages renders moot the Appellants' other arguments regarding damages.
CONCLUSION
For the foregoing reasons, we vacate, in part, the Jefferson Circuit Court's August 13, 2013 final judgment and remand for a new trial on certain of Cornerstone's claims in accordance with this Opinion and with the following directions. The parties need only retry those claims dependent upon the existence or non-existence of Roby's non-competition agreement. We have identified such claims with particularity in section B of this Opinion. We affirm the jury's verdicts of liability in favor of Cornerstone on its claims of misappropriation of trade secrets and tortious interference with existing and prospective business relationships and all remaining claims unrelated to Roby's non-compete agreement and those not challenged by Appellants in this appeal. However, on remand and retrial of these certain claims, the circuit court shall instruct the jury that damages must be re-allocated among any and all claims for which Appellants are found liable.
ALL CONCUR.

The complaint also alleged a violation of uniform trade secrets and interference with prospective contractual relations against unknown defendants.

The verdict was not unanimous on any count.

A fuller reading of the record demonstrates that the scrivener/juror had mistakenly inserted a "0" in the thousands column so that damages on each verdict read $1,650,976.26 instead of the intended figure for each verdict, $165,976.26, for a total award on the ten counts of $1,659,762.60.

The jurors had also mistakenly written this figure, $165,976.26, on the line awarding damages on Kaufman's counterclaim for which the jury had already found no liability.

The circuit court excluded from the final judgment the damages erroneously awarded by the jury related to Kaufman's counterclaim.

Kentucky Rules of Evidence.

Kentucky Rules of Civil Procedure.

Kentucky Rules of Civil Procedure.

CR 59.01 authorizes a new trial for a host of causes, including "(a) Irregularity in the proceedings of the court [or] jury ... by which the party was prevented from having a fair trial"; "(b) Misconduct of the jury"; "(f) That the verdict is not sustained by sufficient evidence, or is contrary to law"; and "(h) Errors of law occurring at trial and objected to by the party under the provisions of these rules."

Cornerstone's interference claims each have two components. Each claim alleges Kaufman and ACK interfered with Cornerstone's contractual relationship with Roby, and interfered with Cornerstone's existing and prospective contractual and business relationships with its customers. (R. 305-07). Only Cornerstone's interference claims related to Roby's non-competition agreement need be retried on remand. Cornerstone's interference claims related to its customers will be discussed in detail later in this Opinion.

Our decision also affects the jury's verdict in favor of Cornerstone on its breach of contract claim against Roby. As previously noted, Roby settled during the pendency of this appeal. We think it best left to the parties and the circuit court to determine how to handle this factual circumstance upon remand.

As referenced in note 10, Cornerstone's interference claims have two components. Appellants' arguments here address only Cornerstone's interference claims related to its existing and prospective contractual relationships with its clients.

See note 6.